# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ITALO ANTHONY MICELI,
*Plaintiff,*

v.

JOHN MEHR et al.,
*Defendant.*

No. 3:17-cv-00029 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Italo Anthony Miceli ("Plaintiff") has sued the Town of Rocky Hill ("Rocky Hill"),

Town Manager John Mehr, former Town Manager Guy Scaife, the Chief of Police of the Rocky

Hill Police Department, Michael D. Custer, and Lieutenant Robert Catania, also of the Rocky

Hill Police Department, in their individual and official capacities, and Robert Lombardo, a

resident of Rocky Hill. Compl., ECF No. 1 (Jan. 6, 2017).

Mr. Miceli alleges that Rocky Hill and the named public officials (collectively "Town

Defendants") (1) violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

("ADA"); (2) retaliated against him in violation of the ADA, 42 U.S.C. § 12203; (3) retaliated

against him in violation of the First Amendment; (4) violated Connecticut Fair Employment

Practices Act, Conn. Gen. Stat. § 46a-60(a) ("CFEPA"); and (5) intentionally inflicted emotional

distress. *Id.* ¶¶ 37-57. The ADA and CFEPA claims, Counts One and Four, are brought against

the Town only. Mem. in Opp. to Town Defs. Mot. ("Pl.'s Opp. to Town Defs."), ECF No. 139 at

8 (May 22, 2019). As to Mr. Lombardo, a private citizen, Mr. Miceli claims (5) intentional

infliction of emotional distress, as well as (6) defamation and (7) tortious interference. Compl. ¶¶

53-66.

Mr. Lombardo has moved for summary judgment as to all claims against him, as have the

1

Town Defendants, excluding Robert Catania, who was dismissed from the case. Mot. for Summary Judgment ("Lombardo Mot."), ECF No. 134 (Apr. 16, 2019); Mot. for Summary Judgment ("Town Defs. Mot."), ECF No. 135 (Apr. 19, 2019); *see also* Stipulation of Dismissal, ECF No. 133 (Apr. 15, 2019).

For the following reasons, the Town Defendants' motion for summary judgment is **GRANTED** with respect to the ADA discrimination claim, the ADA retaliation claim, and the First Amendment retaliation claim**.**

The Court declines to exercise supplemental jurisdiction over the remaining state law claims against the Town Defendants, and similarly declines to exercise supplemental jurisdiction over the claims against Mr. Lombardo.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Allegations

Mr. Miceli's claims arise out of his employment as a police officer with the Town of Rocky Hill, a position he held for twelve years[1] until his termination on November 29, 2016. Plaintiff's Local Rule 56(a)(2) Statement of Facts in Opp. to Town Defs. Mot. ("Pl.'s SMF – Town Defs."), ECF No. 139-1 ¶¶ 1-2 (May 22, 2019).

John Mehr is the current Town Manager of the Town of Rocky Hill. Compl. ¶ 6. From October 2014 until August 30, 2016, Guy Scaife served as Rocky Hill's Town Manager. *Id.* ¶ 5; *see also* Ex. 1: Affidavit of Italo Miceli ("Miceli Affidavit"), ECF No. 139-3 ¶ 12 (May 22, 2019). Michael D. Custer is the Chief of Police of Rocky Hill. Compl. ¶ 7. Robert Catania is a police lieutenant of Rocky Hill. *Id.* ¶ 8. Robert Lombardo is a neighbor of Mr. Miceli, and a

---

[1] Mr. Miceli served in the Air Force before his employment with Rocky Hill, and he was recalled to active duty in Afghanistan in 2007-2008, while still employed with the Town of Rocky Hill. *See* Pl.'s SMF – Town Defs. ¶ 2.

resident of Rocky Hill. *Id.* ¶ 9; Plaintiff's Local Rule 56(a)(2) Statement of Facts in Opp. to Lombardo Mot. ("Pl.'s SMF – Lombardo"), ECF No. 138-1 ¶ 1(May 8, 2019).

Mr. Miceli alleges that in his eleven years of employment before Mr. Scaife's tenure as Town Manager, "he never received any complaints of misconduct towards the public." Miceli Affidavit ¶ 15. The claims in this lawsuit are organized around several incidents, as detailed more specifically below.

The Humvee Purchase

In August 2011, after the Town Council authorized an auction for various surplus equipment, Mr. Miceli purchased a military-style Humvee and tractor truck for $100. Pl.'s SMF – Town Defs. ¶¶ 11-12.

In March 2015, the U.S. Attorney's Office received a complaint from the Town of Rocky Hill about Mr. Miceli's purchase, and forwarded it to the Federal Bureau of Investigation ("FBI"). Pl.'s SMF – Town Defs. ¶ 15. The FBI then investigated whether there was an unauthorized sale of the Humvee and tractor. *Id.* ¶ 16.

On or about May 12, 2015, two FBI agents interviewed Mr. Miceli regarding his purchase of the Humvee. *Id.* ¶ 17. Special Agent Ron Offutt took notes during this interview, and the notes were used in his report. *Id.* ¶ 18-19. After learning of the auction allegedly by a newspaper advertisement, Mr. Miceli claims to have delivered his bid to the relevant town employee, Glenn Parent. Ex. I: Deposition of Ron W. Offutt ("Offutt Depo."), ECF No. 135-11 at 17:23-20:13 (Nov. 26, 2018); *see* also Miceli Affidavit ¶ 10. Mr. Miceli "stated [to Agent Offutt] that a friend of his put up half the money and paid $50 toward the total $100" for the Humvee and tractor. Offutt Depo. at 21:4-19.

Mr. Miceli further alleges that when Chief Custer spoke with him about the Humvee, he stated "Listen . . . Scaife is after you. . . . He's after both of us, but right now he's got his sights set on you." Ex. 2: Deposition of Italo Miceli ("Miceli Depo."), ECF No. 138-4 at 157:2-16 (Sept. 22, 2017). He alleges that this conversation occurred in the Chief's office, before he sent a letter to the Office of the Chief State's Attorney. *Id.* at 157:17-19.

Letter to Chief State's Attorney

On June 19, 2015, Mr. Miceli sent a letter to the Office of the Chief State's Attorney, in which he claimed, *inter alia*, that he purchased the Humvee from Rocky Hill through Rocky Hill's silent auction. Pl.'s SMF – Town Defs. ¶ 25; *see also* Ex. J: Miceli's Letter to State Wide Prosecution (the "OCSA Letter"), ECF No. 135-12 (June 19, 2015).

In the letter, Mr. Miceli began by describing his issues with Mr. Lombardo, and alleges Mr. Lombardo filed numerous complaints with Rocky Hill's Police Department and Planning and Zoning – all of which were allegedly unfounded. OCSA Letter at 1. Mr. Miceli also details other wrongs allegedly committed by Rocky Hill officials, specifically the then-Town Manager Scaife, who he alleges collaborated with Mr. Lombardo to harass him in looking for "any type of violations with [his] house and property." *Id.*; *see also id.* at 4 ("I was happily living here [in Rocky Hill] until this new Town Manager Guy Scaife and Robert Lombardo started harassing and bullying me.").

Along with many of the claims raised in this case, Mr. Miceli's letter relates the following complaints: issues with Rocky Hill planning and zoning, stating he did not have a certificate of occupancy for part of his house; fines for municipal recreational vehicles and blight; numerous house and property inspections and threats of fines; the Town forcing him to break down his compost; forcing him to move his military Humvee; Mr. Lombardo's property

not getting immediately fined, despite allegedly intruding more into State property; and Mr. Lombardo's allegedly unlicensed plumbing business. *See* OCSA Letter 1-4. Mr. Miceli emphasizes that the "quality of [his] life is suffering greatly due to the harassment and bullying and receiving from . . . Guy Scaife . . . and Robert Lombardo." *Id.* at 3.

Mr. Miceli alleges that Chief Custer, Mr. Scaife, and Lt. Catania were on notice about this letter before Chief Custer assigned Lt. Catania to investigate claims of misconduct regarding Mr. Miceli. *See* Ex. 6: Deposition of Robert Catania ("Catania Depo."), ECF No. 134-2 at 136:6-138:11 (Nov. 5, 2018) (noting that he notified Interim Town Manager Scaife about the OCSA Letter, per Chief Custer's instructions, when he became aware the letter existed, but not recalling when that date was).

Incidents with Lombardo

The relationship between Mr. Miceli and Mr. Lombardo allegedly deteriorated more than a decade ago due to an incident involving their then-minor daughters. Pl.'s SMF – Lombardo ¶¶ 2-3; *see also* Miceli Depo. at 101:12-102:25.

Mr. Miceli alleges that from October 2014 through the filing of the Complaint, Mr. Lombardo "allegedly initiated and pursued a complaint of slander and false complaints and investigations against" Mr. Miceli, Pl.'s SMF – Lombardo ¶ 20 (citing Compl. ¶ 20), and that these ongoing disputes were used by the Defendants "to harass and intimidate the Plaintiff based upon the Defendants' perception that the Plaintiff suffered from mental disability." *Id.* ¶ 21 (citing Compl. ¶ 21). Additionally, Mr. Miceli alleges Mr. Lombardo complained about part of his property, which led to numerous visits in 2014-2015 from zoning officer Frank Kelly, who declared his property as "blight." *Id.* ¶¶ 5-6. Furthermore, Mr. Miceli alleges that "[w]hen Kelly investigated he told me that he told [then-Interim Town Manager] Scaife that Lombardo's

complaint was not valid and that it was not blight, but [then-Interim Town Manager] Scaife ordered him to cite me for a violation." Miceli Affidavit ¶ 16.

Mr. Miceli also alleges that Lt. Catania was related to Mr. Lombardo's wife, Diane, which Mr. Lombardo denies. Pl.'s SMF – Lombardo ¶¶ 16-17; *see also* Catania Depo. at 143:8-22 (noting there is no familial relation between him and the Lombardos, but explaining that he is friends with Pete Mirabelli, who is the husband of Diane's sister Lisa). Further, Mr. Miceli alleges that Mr. Lombardo and Lt. Catania "conspired to defame and attempt[ed] to terminate" his employment. Pl.'s SMF – Lombardo ¶ 22.

In the spring of 2015, Mr. Miceli alleges that Mr. Lombardo "falsely reported" to the police and Lt. Catania that Mr. Miceli slashed his pool liner. Miceli Affidavit ¶ 17. He claims that on numerous occasions from 2015 to now, Mr. Lombardo "has yelled at persons visiting [Mr. Miceli] 'why are you friends with a liar and a thief.'" *Id.* ¶ 31.

In May 2015, Mr. Miceli further alleges that Mr. Lombardo and then-Town Manager Scaife wrongfully notified the State Department of Transportation because his vehicle and a rock were in the state's right of way. Pl.'s SMF – Lombardo ¶ 7. Mr. Miceli claims the rock and other items in question were allegedly placed years earlier in 1996, with Mr. Lombardo's help. Miceli Affidavit ¶ 25. According to Mr. Miceli, Mr. Lombardo discussed this complaint with Lt. Catania, who allegedly encouraged him to complain to then-Town Manager Scaife. *Id.* ¶ 26.

Mr. Miceli makes various other allegations about Mr. Lombardo: that Mr. Lombardo allegedly said derogatory things about him to his children, *id.* ¶ 8, and that Mr. Lombardo allegedly had claimed to Chief Custer or then-Town Manager Scaife that Mr. Miceli "had chased [him] with his service weapon and had threatened to kill the Lombardo family," *id.* ¶ 11. Mr. Miceli alleges that all of Mr. Lombardo's complaints were fabricated. *See* Deposition of Italo

Miceli, ECF No. 134-2 at 177:12-179:14 (Sept. 22, 2017) (describing the allegation that Mr. Miceli had chased Mr. Lombardo with his service weapon, and admitting there was no investigation into the matter); *see also* Miceli Affidavit ¶¶ 18-19 (describing how Sergeant Fontaine told Mr. Miceli around February 2015 that "Lombardo had falsely reported" about the service weapon incident, and "that the department looked into [his] weapons claim and found it to be unfounded . . . absurd.").

Sometime in June 2016, Mr. Lombardo allegedly told Mr. Miceli that he would be fired by the end of that summer, and that he was "a mental case." Pl's SMF – Lombardo ¶ 4; *see also* Miceli Affidavit ¶ 20.

In June of 2016, there also was a physical altercation between Mr. Miceli and Mr. Lombardo's nephew, Robert. Pl.'s SMF – Lombardo ¶¶ 13-15; *see also* Ex. T: Rocky Hill Police Dept. Report of Internal Investigation of Anthony Miceli ("Daigle Report – Lombardo"), ECF No. 135-22 at 11 (Oct. 27, 2016) ("Officer Miceli clearly understood, and readily admitted, that his decision to cross the street and challenge the Lombardos was a poor decision.").

In August 2016, Mr. Miceli alleges that Mr. Lombardo "falsely reported" to Lt. Catania, Chief Custer, and then-Interim Town Manager Scaife that he slashed Mr. Lombardo's pool liner. *See* Miceli Affidavit ¶ 21. Mr. Miceli alleges Mr. Lombardo told him he made his complaints in order to get him (Mr. Miceli) fired. *Id.* ¶ 23.

Mr. Miceli "alleges that false complaints by Defendant Lombardo led Defendant Town Manager Guy Scaife to begin a pattern of harassment and discrimination against him," which led to the "repeated and unwarranted internal investigations" into him, "zoning enforcement investigations and inspections," "false accusations," "fines," "[f]alse complaints" to various state agencies about him, "[m]aking a devious complaint," and a FBI investigation into Mr. Miceli's

alleged purchase of the Humvee. Pl's SMF – Lombardo ¶ 19 (citing Compl. ¶ 19). In support of these allegations, Mr. Miceli notes that when the previous Town Manager Barbara Gilbert investigated some of Mr. Lombardo's earlier claims, no action was taken. *Id.* at Additional Material Facts ¶ 6. Mr. Miceli alleges that only when Mr. Scaife became Town Manager did Mr. Lombardo's complaints gain traction. Miceli Affidavit ¶¶ 11-14.

Ultimately, Mr. Miceli alleges that Mr. Lombardo's complaints "induced" Rocky Hill to terminate his employment in November 2016. Pl's SMF – Lombardo ¶ 26 (citing Compl. ¶ 65).

Rumors about Mr. Miceli

In June 2015, Mr. Parent allegedly "went to the Whole Donut Shop and told a group of his friends . . . that I had PTSD and was on the rubber gun squad." Miceli Affidavit ¶ 38. Mr. Miceli claims that Officers Keith Baker, Tom Carpenter, and Bryan Kelly informed him they heard a rumor that Mr. Miceli had PTSD and was on the rubber gun squad. *Id.* ¶ 42. At or around the same time, Mr. Miceli also claims he overhead Lt. Catania telling Officers Cherie Dairy, Vanessa Billotto, Sarah Raymond, and Rob Cieri that he had PTSD. *Id.* ¶ 43.

Near the end of June 2015, Mr. Miceli claims that Officer Lefebre told him that he had PTSD and that he would "'be getting a red gun soon' (meaning red rubber gun)." *Id.* ¶ 43.

The Range Incident

On or about July 29, 2015, when Mr. Miceli was assigned to complete rifle training, his vehicle became stuck in mud. Pl.'s SMF – Town Defs. ¶ 4. Officer Sara Raymond, the lead range instructor that day, reported that Mr. Miceli allegedly "yelled" at her and was "clearly upset" after she asked him whether he wanted her to call a tow truck. Ex. F: Rocky Hill Police Dept. Internal Investigation Summary Report CCN 15-03 ("Klett Report"), ECF No. 135-8 at 14 (Sept. 24, 2015) (describing an interview with Officer Raymond). Officer Raymond decided to cancel

Mr. Miceli's firearm training for the day because "he had exhibited anger which could have led [to] range safety issues." *Id.*

Subsequently, Chief Custer authorized Lieutenant Brian Klett to initiate an internal investigation into the range incident. Custer Affidavit at ¶ 4. After interviewing Officer Raymond and other officers present at the range, Lt. Klett concluded that Mr. Miceli "failed to exercise patience [or] control his temper, and engaged in argumentative discussions with [Officer] Raymond which included the use of profanity." Klett Report at 14-16, 18; *see also* Ex. 3: Deposition of Lieutenant Brian Klett, ECF No. 139-3 at 122:23-124:2 (May 22, 2019) ("Klett Depo.")("[Mr. Miceli] was acting in an aggravated, intense manner, engaged in arguments with the range masters, and on that information, the range masters all concurred that he was not in a state of readiness to be on the range to learn.").

On August 3, 2015, Chief Custer assigned Lt. Catania to investigate Mr. Miceli with respect to whether Mr. Miceli "purposely parked a privately owned vehicle upon the State of Connecticut right of way, for the purpose of creating a risk to his immediate neighbor," "did not pay a required fee and appropriately obtain a certificate of occupancy for his private home," and "was in purposeful violation of the Town of Rocky Hill's ordinance on blighted property, and . . . failed to cooperate or acted inappropriately with town staff." Ex. M: Deposition of Michael D. Custer ("Custer Depo."), ECF No. 135-15 at 114:5-115:2 (Sept. 25, 2018); *see also* Pl.'s SMF – Town Defs. ¶ 8 (disputing the reason behind the investigation).

On October 8, 2015, Mr. Miceli was issued a written reprimand for behavior that was "improper," "aggressive[,] and disrespectful" in regards to the incident with Officer Raymond. Ex. O: Rocky Hill Police Dept. Reprimand Letter ("Reprimand Letter"), ECF No. 135-17 (Oct. 8, 2015).

On October 9, 2015, Mr. Miceli was placed on indefinite administrative leave. Miceli Affidavit ¶ 18.

Around November 2015, Chief Custer ordered Mr. Miceli to attend a fitness for duty examination "because he had displayed confrontational and argumentative behavior." Custer Affidavit ¶ 7. He allegedly would do so if an individual exhibits "behavior in the workplace that would be characterized as abnormal," and if that behavior "inhibits the individual from doing their job." Ex. 1: Deposition of Michael D. Custer, ECF No. 139-7 at 92:2-11 (Sept. 25, 2018); *see also id.* at 98:18-99:5 (stating that he would order a fitness for duty exam if he "believe[d] an officer might be a danger to the community").

On January 4, 2016, Mr. Miceli allegedly was informed he had passed the fitness for duty examination, but was not immediately reinstated. Miceli Affidavit ¶¶ 20-21.

On January 20, 2016, after Lt. Catania's investigation, Chief Custer concluded that Mr. Miceli's "behavior was improper and in violation of Departmental Rules of Conduct, Connecticut General Statutes, DOT regulations and Town ordinances." Ex. W: CCN-2015-04, Four-Day Suspension (Unpaid) and Counseling ("Suspension Letter"), ECF No. 135-25 at 2 (Jan. 20, 2016). Chief Custer also noted that Mr. Miceli had declined to move his vehicle off of the State's right of way, after receiving a certified notice from the State Department of Transportation and specific direction from Lt. Catania. *See id.* at 1-2. But Mr. Miceli notes that when Chief Custer ordered him to move his vehicle, he did so immediately. Miceli Affidavit ¶¶ 31-32. Following mediation and Mr. Miceli's agreement to attend counseling, Chief Custer reduced his suspension from four to two days. Custer Depo. at 174:20-175:10.

Connecticut Commission on Human Rights and Opportunities Complaint

On or about December 23, 2015, Mr. Miceli filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging many of the same claims he is raising in this lawsuit. Pl.'s SMF – Town Defs. ¶¶ 49-51.

On February 1, 2016, the Town Defendants received a notice of Mr. Miceli's CHRO Complaint based on employment discrimination under the ADA. Ex. J: Notice of Charge of Discrimination, ECF No. 135-18 (Feb. 2, 2016).

On or about May 13, 2016, Mr. Miceli filed a second complaint with the CHRO, in which he alleged the Town Defendants retaliated against him based on his first complaint. Pl.'s SMF – Town Defs. ¶ 52; *see also* Miceli Affidavit ¶ 37 ("Defendants[] retaliated against me for filing my December 23, 2015 charge of discrimination, by delaying my return from work from the bogus fitness for duty and then starting more investigations by Daigle.")

On November 10, 2016, the CHRO released Mr. Miceli's complaint from its jurisdiction, thus authorizing him to commence a civil action on the claims. Ex. 1: State of Conn. CHRO Release of Jurisdiction, ECF No. 1-1 (Nov. 10, 2016).

The Daigle Reports

On April 1, 2016, Rocky Hill retained Eric P. Daigle, an attorney, to conduct an internal affairs investigation as to whether "Officer Miceli mislead the State's Attorney when he stated that he purchased a military style Humvee through a bona-fide auction." Ex. S: Rocky Hill Police Dept. Report of Internal Investigation of Anthony Miceli ("Daigle Report – Humvee"), ECF No. 135-21 at Ex. C: Retention Letter (Oct. 11, 2016).

On June 30, 2016, Rocky Hill assigned Mr. Daigle "to conduct an investigation into Plaintiff's truthfulness regarding the circumstances of his purchase of the military style Humvee from the Town of Rocky Hill." Ex. A: Affidavit of Chief Michael Custer ("Custer Affidavit"),

ECF No. 135-3 ¶ 11 (Apr. 17, 2019); *see also* Daigle Report – Humvee at 2. On the same date, Rocky Hill also hired Mr. Daigle to investigate Mr. Lombardo's complaints against Mr. Miceli, and to ascertain if Mr. Miceli's conduct towards Mr. Lombardo violated Rocky Hill Police Department Policy. Ex. T: Rocky Hill Police Dept. Report of Internal Investigation of Anthony Miceli ("Daigle Report – Lombardo"), ECF No. 135-22 at 2 (Oct. 27, 2016).

On or about July 26, 2016, Mr. Daigle took Mr. Miceli's statement. Daigle Report – Humvee at 12. Mr. Miceli stated he learned the Humvee and tractor were for sale from a newspaper advertisement and that he wrote a letter containing a bid of $50 for each vehicle. *Id.* at 12. Mr. Miceli also "described a long, tumultuous relationship between him and his neighbor," Mr. Lombardo. Daigle Report – Lombardo at 6.

Based on his investigation into the Humvee purchase, Mr. Daigle concluded that there was sufficient evidence to determine that Mr. Miceli was "untruthful in violation of Rocky Hill Police Department rules, regulations, or policies," and noted "[t]he evidence is clear that there was no a [sic] silent auction." Daigle Report – Humvee at 37-38.

Based on his investigation into Mr. Miceli's altercation with Mr. Lombardo and his nephew, Mr. Daigle concluded that there was sufficient evidence to determine Mr. Miceli, "in engaging with Robert and Michael Lombardo, did not exercise common sense or good judgment." Daigle Report – Lombardo at 10. Mr. Daigle also noted Mr. Miceli "clearly understood, and readily admitted, that his decision to cross the street and challenge the Lombardos was a poor decision." *Id.* at 11.

Alleged Disparate Treatment

In November 2016, there was a verbal altercation between Lt. Catania and Sergeant Joseph Phelps. *See* Ex. 14: Deposition of Joseph Phelps ("Phelps Depo."), ECF No. 139-16 at

45-52 (Nov. 9, 2018) (describing the verbal altercation and stating there was a meeting with Human Resources following it).

Termination

In a letter dated November 21, 2016, Chief Custer recommended to Interim Town Manager Mehr that he terminate Mr. Miceli's employment. Ex. K: Recommendations for Discipline Following Nov. 14, 2016 Loudermill Hearing Concerning CCN #2016-08 and CCN #2016-04 ("Custer – Mehr Letter"), ECF No. 135-13 (Nov. 21, 2016). Chief Custer allegedly considered the two investigations by Mr. Daigle as well as the internal investigation, based on the October 8, 2015 incident with Officer Raymond at the firing range. *See id.* at 2 ("In ordinary instances, altercations such as the current matter – in isolation – would result in suspension. However, it would be irresponsible to not consider Ofc. Miceli's prior disciplinary history, which reflects an unremitting pattern of deflecting responsibility for his conduct."). "Based on his history of progressive discipline and a clear, demonstrated inability to control his emotions, in stressful situations," Chief Custer concluded that "Ofc. Miceli lacks the temperament, self-control, and discretion to remain employed as a police officer." *See id.* at 3.

In a letter dated November 28, 2016, Interim Town Manager Mehr terminated Officer Miceli from his employment as a police officer for Rocky Hill, effective November 29, 2016. Ex. V: Town of Rocky Hill Police Dept. Internal Investigation CCN #2016-08 and CCN #2016-04 ("Mehr Termination Letter"), ECF No. 135-24 at 2 (Nov. 28, 2016). Interim Town Manager Mehr reiterated that Mr. Miceli violated Police Department Rule of Conduct 1.01 for Violation of Rules, Rule of Conduct 1.02 for Unbecoming Conduct, and Rule of Conduct 1.42 for Truthfulness. *Id.* at 1.

The International Brotherhood of Police Officers, Local 316 ("Union"), grieved Mr. Miceli's termination, and the Union and Rocky Hill entered arbitration. Ex. E: Arbitration Award for Town of Rocky Hill and IBPO Local 316, Case #2017-A-0159 Italo Miceli, Conn. State Bd. of Mediation and Arbitration ("Arbitration Award"), ECF No. 135-7 (Sept. 25, 2017).

On March 28, 2019, over Mr. Miceli's objection and attempt to vacate the arbitration decision, the Superior Court of the Judicial District of Hartford confirmed the Arbitration Award. Pl.'s SMF – Town Defs. ¶ 48.

The Town Defendants have consistently asserted that they never stated to anyone that Mr. Miceli had PTSD, and they emphasize that they did not perceive Mr. Miceli to have Post-Traumatic Stress Disorder. *See* Custer Affidavit ¶¶ 8-10; Ex. D: Affidavit of Guy Scaife ("Scaife Affidavit"), ECF No. 135-6 at ¶¶ 5, 6 (Apr. 12, 2019); Ex. X: Affidavit of John Mehr ("Mehr Affidavit"), ECF No. 135-26 ¶¶ 10, 11 (Apr. 12, 2019).

### B.     Procedural History

On January 6, 2017, Mr. Miceli sued Rocky Hill, Town Manager Mehr, Mr. Scaife, Lt. Catania, and Chief Custer, individually and in their official capacities as Rocky Hill officials; and Mr. Lombardo. Compl., ECF No. 1 (Jan. 6, 2017).

The parties engaged in discovery, and filed various corresponding motions for extensions of time. *See* Docket Entries.

On April 15, 2019, Mr. Miceli filed a stipulation of dismissal as to Lt. Catania, and he has been dismissed from the case. Stipulation of Dismissal, ECF No. 133 (Apr. 15, 2019).

On April 16, 2019, Mr. Lombardo moved for summary judgment. Lombardo Mot.

On April 19, 2019, the Town Defendants moved for summary judgment. Town Defs.

Mot.; *see also* Local Rule 56(a)(1) Statement of Undisputed Material Facts ("Town Defs.'s SUMF"), ECF No. 135-1 (Apr. 19, 2019); Memorandum in Support of Town Defs. Mots ("Town Defs. Mem."), ECF No. 135-2 (Apr. 19, 2019).

On May 8, 2019, Mr. Miceli timely opposed Mr. Lombardo's motion for summary judgment. Memorandum in Opposition to Lombardo Mot. ("Pl.'s Opp. to Lombardo"), ECF No. 138 (May 8, 2019); *see also* Pl.'s SMF – Lombardo.

On May 22, 2019, Mr. Miceli opposed the Town Defendants' motion for summary judgment. Memorandum in Opposition to Town Defs. Mot. ("Pl.'s Opp. to Town Defs."), ECF No. 139 (May 22, 2019); *see also* Pl.'s SMF – Town Defs.

On June 10, 2019, the Town Defendants timely replied to Mr. Miceli's opposition. Reply to Pl.'s Opp. to Town Defs. ("Town Defs. Reply"), ECF No. 142 (June 10, 2019).

Mr. Lombardo did not submit a reply to Mr. Miceli's opposition initially, but did file a response on October 30, 2019, a day before oral argument. *See* ECF No. ___ (Oct.30, 2019).

On October 31, 2019, the Court held a hearing on the motions for summary judgment. Minute Entry, ECF No. 149 (Oct. 31, 2019).

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.") (citing *Anderson*, 477 U.S. at 248).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d

Cir. 2017)("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

This lawsuit involves the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b)(1), the First Amendment, the Connecticut Constitution, and various state law claims. [2]

Because the federal claims at issue only involve the Town Defendants, the Court will address their motion for summary judgment first – if Mr. Miceli has no viable claims under the U.S. Constitution or any federal statute, the Court then will determine whether it will exercise supplemental jurisdiction over the remaining state-law claims against the Town Defendants and Mr. Lombardo, against whom only state-law claims were brought. [3]

---

[2] Although there was some issue that the ADA and CFEPA claims were brought against the Town Defendants as individuals, Mr. Miceli has since conceded that his "ADA and CEFPA [sic] claims were brought against the Defendant Town of Rocky Hill only."  *See* Pl.'s Opp. to Town Defs. at 8.

[3] While the Town Defendants argue that they are entitled to summary judgment because of an arbitration award in a different proceeding, an arbitration award does not have preclusive effect in federal court. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49 (1974). ("Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement."). In addition, "a negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee." *See Collins v. N.Y. City Transit Auth.,* 305 F.3d 113, 119 (2d Cir. 2002). "[T]o survive a motion for summary judgment based on insufficient evidence to raise a triable issue of fact, a plaintiff who has failed in arbitration must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Morel v. American Bld. Maint. Co.*, 124 Fed. Appx. 671, 672 (2d Cir. 2005) (internal citations omitted).

## A. The ADA Discrimination Claim

The ADA provides that: "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities[4] of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Additionally, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009). Under this burden-shifting framework, the "plaintiff must establish a prima facie case [of discrimination]; the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of

Thus, the Court will consider the arbitration award, to the extent necessary in resolving the issues raised in this motion, but not as preclusive of Mr. Miceli's federal claims.

[4] Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

persuasion that the proffered reason is a pretext." *Sista v. CDC Ixix N.A., Inc.*, 445 F.3d 161, 169

(2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty.*

*Adolescent Program*, 198 F.3d 68, 72 (2d Cir.1999)).

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff

must show:

> (a) that his employer is subject to the ADA; (b) that he is disabled within the
> meaning of the ADA or perceived to be so by his employer; (c) that he was
> otherwise qualified to perform the essential functions of the job with or without
> reasonable accommodation; and (d) that he suffered an adverse employment
> action because of his disability.

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d. Cir. 2008) (citing *Jacques v. DiMarzio,*

*Inc.*, 386 F.3d 192, 198 (2d Cir. 2004)).

The Town Defendants contend that Mr. Miceli fails to establish a *prima facie* case of

disability discrimination because he "can point to no evidence that any Defendant perceived him

as mentally ill." Town Defs. Mem. at 14. Because Mr. Miceli has failed to meet his burden of

proving "that a perceived disability actually motivated the employer's conduct," the Town

Defendants argue he has failed to show he was terminated because of a perceived disability. *Id.*

at 15-16. In addition to Mr. Miceli's "pattern of misconduct," which warranted the investigations

and progressive discipline, the Town Defendants point to his "ongoing lack of truthfulness

regarding how he obtained the Humvee" and his "fist fight with civilians" as the legitimate and

nondiscriminatory reasons for his termination. *Id.* at 16. In support of their argument, they cite to

the various affidavits of the named Town Officials (Mehr, Scaife, and Custer) as well as Mr.

Daigle's investigation reports. *Id.* (citing Mehr Affidavit ¶¶ 10, 11; Custer Affidavit ¶¶ 8-10;

Scaife Affidavit ¶¶ 5,6).

The Town Defendants argue that, even if Mr. Miceli were to establish a *prima facie* case, he cannot show that their actions "were actually motivated by a retaliatory animus" or that "retaliation is a plausible explanation." *Id.* They assert that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.* at 17 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original)). In support of this assertion, the Town Defendants cite to the various affidavits of the named Rocky Hill officials. *Id.* (citing Mehr Affidavit ¶¶ 10, 11; Custer Affidavit ¶¶ 8-10; Scaife Affidavit ¶¶ 5,6). They also note that they, as well as the State Board of Mediation and Arbitration, which issued an award in their favor, credited Mr. Daigle's investigative findings that Mr. Miceli lied about the manner in which he obtained the Humvee as a major reason for his termination. Town Defs. Mem. at 17.

Additionally, the Town Defendants emphasize Mr. Miceli's own admission that he engaged in a physical altercation with civilians – his neighbor Mr. Lombardo and Mr. Lombardo's nephew. *Id.* All of these actions "led to a conclusion that Plaintiff engaged in conduct unbecoming a police officer," and the Town Defendants argue "[t]hese are legitimate non-discriminatory reasons for terminating an employee." *Id.* With no evidence that these reasons are pretextual, they urge the Court to enter summary judgment on Mr. Miceli's ADA discrimination claim. *Id.*

In response, Mr. Miceli argues that he was perceived to have PTSD or issues with "anger" and "mental instability" due to his military service, and that the Town officials "parlayed [this perception] into a retaliatory fitness for duty examination, suspensions and ultimately [his] termination." Pl.'s Opp. – Town Defs. at 9. Mr. Miceli emphasizes that he has met his burden to demonstrate that "his claim of disability caused adverse employment actions." *Id.* at 10. In

support, Mr. Miceli points to his own affidavit, and the fact that Chief Custer required him to attend a fitness for duty examination "because he had displayed confrontational and argumentative behavior." *Id.* at 11 (quoting Custer Affidavit ¶ 7).

To Mr. Miceli, Chief Custer's criteria for ordering a fitness for duty examination, which looks for "behavior in the workplace that would be characterized as abnormal in terms of normal behavior of the individual . . . that potentially inhibits [them] from doing their job," *id.* (quoting Custer Depo. at 92:2-11), "are the same as identifying someone with a mental disability including PTSD or anger issues." *Id.* In order for Mr. Miceli to have been ordered to take a fitness for duty examination and thereafter undergo psychiatric counseling, Mr. Miceli argues the Town Defendants had to have perceived him as having a mental disability, or else they would have no cause to do so besides plain harassment. *Id.* at 11-12. Further, Mr. Miceli emphasizes his passage of the fitness for duty examination "demonstrates that it was suspect." *Id.* at 12.

Mr. Miceli also argues that the Town Defendants "have not proffered a legitimate non-discriminatory reason for the adverse employment actions against" him. *Id.* at 13. Mr. Miceli disputes the credibility and veracity of Mr. Daigle's investigation, which was the basis for much of the Town Defendants' actions. *Id.* at 13-14. In further support of his allegations, Mr. Miceli argues that Mr. Mehr, the then-Finance Director, authorized a draft of the ad for the Humvee. *Id.* at 14. After more general denials that there is not indisputable evidence of his physical altercation with civilians, Mr. Miceli urges the Court to deny the Town Defendants' motion for summary judgment.

In reply, the Town Defendants re-assert they did not perceive Mr. Miceli to have a mental disability and that they had legitimate nondiscriminatory reasons to terminate Mr. Miceli from employment as a police officer. Town Defs. Reply at 5-7.

The Court agrees.

Mr. Miceli has failed to establish a *prima facie* case because he failed to provide admissible evidence that the Town Defendants perceived him as having PTSD. Mr. Miceli has only presented bald assertions. *See* Pl.'s Opp. – Town Defs. at 12 (stating that he was told by other officers that the Town officials referred to him as being on the "rubber gun squad," an allegedly derogatory reference to an officer whose weapon is taken away). Chief Custer testified that he ordered the fitness for duty exam because Mr. Miceli "had displayed argumentative and confrontational behavior." Custer Affidavit ¶ 7. Mr. Miceli has not produced a single witness to testify that Chief Custer actually was concerned about Mr. Miceli having PTSD when he terminated him, or that Chief Custer even considered the issue of PTSD in relationship to Miceli at any time of his employment with the Rocky Hill Police Department.

In the absence of this evidence, at oral argument, Mr. Miceli's counsel argued that because Chief Custer knew about the symptoms of PTSD, and testified about them at his deposition, a reasonable jury could conclude that Chief Custer perceived Mr. Miceli to have PTSD and based his decision to terminate Mr. Miceli on that knowledge. At this stage of the case, however, Mr. Miceli must offer admissible evidence that Chief Custer ordered the fitness for duty examination because of a perception that Mr. Miceli had PTSD, and not rely on inadmissible speculation. *See, e.g.*, *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) ("If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" (citing *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997))).

Chief Custer's general knowledge of the symptoms of PTSD is not admissible evidence in this case, absent a causal connection between this knowledge and its specific use in deciding whether to terminate Mr. Miceli. Without a causal connection, this testimony is properly – if not necessarily – excludable because "the court may exclude even evidence that is relevant 'if its probative value is substantially outweighed by' the danger of, *inter alia*, unfair prejudice, or confusion of the issues, or misleading the jury, or wasting time." any probative value to this testimony is far outweighed by its potentially prejudicial effect. *Lore v. City of Syracuse*, 670 F.3d 127, 173 (2d Cir. 2012) (quoting Fed. R. Evid. 403). The issue in this case is not what Chief Custer knows about PTSD, but whether he improperly considered whether Mr. Miceli had PTSD in deciding whether to recommend his termination. And, as noted above, there is nothing in this record to suggest that he considered whether Mr. Miceli had PTSD in making his decision. As a result, whatever Chief Custer knows about PTSD generally is not relevant to this case, and to the extent that it is, the proffered testimony would only be misleading or otherwise cause confusion as to the ultimate issues in this case. *See Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) ("[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."); *cf. Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 928 (In assessing the admissibility of evidence of damages in a breach of contract case, recognizing that if the plaintiff "was unprepared to offer an analysis of factors other than the bare statistics, those statistics, standing alone, would be misleading and would therefore not provide a stable foundation for a reasonable estimate of royalties that would have been earned if [defendant] had not breached." (citation and internal quotation marks omitted)).

Even if Mr. Miceli had created a genuine issue of material fact on whether the Town Defendants perceived him as having a disability, he has not demonstrated that their reasons for terminating him were pretextual. Under the *McConnell Douglas Corp.* burden-shifting framework, even after the plaintiff establishes a *prima facie* case of discrimination, the plaintiff still carries the burden of showing that the defendants' nondiscriminatory reasons were pretextual. *See* 411 U.S. at 804. That is not the case here. The Town Defendants have provided a detailed account of Mr. Miceli's alleged misconduct. *See generally* Daigle Report – Humvee; Daigle Report – Lombardo. Although Mr. Miceli disputes the veracity of Mr. Daigle's findings, as he did before the State Board of Mediation and Arbitration, he cites to no admissible evidence creating a genuine issue of material fact as to Mr. Daigle's findings.

There is no genuine issue of material fact as to whether Town Defendants' reasons for terminating Mr. Miceli were legitimate and nondiscriminatory. *See also* Arbitration Award at 9-13 (describing why a majority of the Panel found the Town had just cause to terminate Miceli, and noting the unpersuasiveness of Mr. Miceli's claims about the Humvee). There is record evidence of Mr. Miceli's conduct on the range with Officer Raymond, his alleged purchase of a Humvee and tractor for $100 from Rocky Hill, and the physical altercation with Mr. Lombardo and Mr. Lombardo's nephew. But there is no record evidence of anyone involved in reporting on these incidents, investigating these incidents, or determining whether Mr. Miceli should be terminated because of these incidents perceiving Mr. Miceli as having a disability.

In contrast, a draft advertisement for the Town's sale of the Humvee is not sufficient to create a genuine issue of fact as to whether the sale of the Humvee ultimately was authorized. *Compare* Pl's Opp. – Town Defs. at 14 (referencing a draft advertisement that Mr. Mehr, then serving as Finance Director, "conveniently forgot about . . . [as] authorized"), *with* Daigle Report

– Humvee at 37-38 ("[t]he evidence is clear that there was no a [sic] silent auction."). Similarly, Mr. Miceli's denial of a "fist fight with civilians" does not create a genuine issue of material fact that consideration of his physical altercation with a private citizen in terminating him was mere pretext. *Compare* Pl.'s Opp. – Town Defs. at 15 ("There is no indisputable evidence that plaintiff was in a 'fist fight with civilians.'"), *with* Daigle Report – Lombardo at 11 (noting that Mr. Miceli "clearly understood, and readily admitted, that his decision to cross the street and challenge the Lombardos was a poor decision."), Miceli Depo. at 198:18-201:23 (describing the physical altercation between Mr. Miceli, Mr. Lombardo, and his nephew). Indeed, Mr. Miceli has not provided any admissible evidence in this record to support his contention that the Town Defendants' reasons for terminating him were discriminatory.

In the absence of admissible evidence, Mr. Miceli has failed to establish a genuine issue of material fact as to whether the Town Defendants discriminated against him based on a perceived disability in violation of the ADA.

Accordingly, Mr. Miceli's ADA discrimination claim against the Town Defendants will be dismissed.

### B. The ADA Retaliation Claim

To state an ADA retaliation claim, a plaintiff must show "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno v. Douglas Elliman– Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate

treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotations omitted) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015); *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

"In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp.*" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). Under this framework, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *See McBride*, 583 F.3d at 96 (citing *Sista*, 445 F.3d at 169). "The proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Finally, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).

The Town Defendants argue that Mr. Miceli's ADA retaliation claim fails as a matter of law because Rocky Hill could not continue to employ a police officer with a history of untruthfulness. Town Defs. Mem. at 34-35 (citing Mehr Affidavit ¶ 14 ("Plaintiff was terminated for lack of truthfulness, poor judgment and angry behavior.")). They argue that there is no causal connection between Mr. Miceli's alleged protected activity of filing a CHRO complaint and his termination as a police officer for one major reason: they were not aware of Mr. Miceli's June

19, 2015, letter to the Office of the Chief State's Attorney ("OCSA Letter") until February 2, 2016, when they received it as an attachment to CHRO's Notice. *Id.* at 34; *see also* Ex. J: Notice of Charge of Discrimination, ECF No. 135-18 (Feb. 2, 2016).

As a result, the Town Defendants submit that Mr. Daigle was first hired to investigate the circumstances of Mr. Miceli's alleged purchase of a Humvee from Rocky Hill at a silent auction, and not as retaliation for either the OCSA Letter or the CHRO complaint. Town Defs. Mem. at 34. The Town Defendants also emphasize the undisputed findings of Mr. Daigle's independent investigation – that Mr. Miceli "had engaged in unbecoming conduct and had been untruthful." *Id.* (referencing Daigle Report – Lombardo and Daigle Report – Humvee).

The Town Defendants also submit that there is no evidence that Mr. Miceli's filing of the CHRO complaint was the but-for cause of the adverse employment action. *Id.* at 35-37. Even if the Court finds a genuine issue of material fact as to whether they perceived Mr. Miceli as disabled, the Town Defendants argue that the record evidence shows that Mr. Miceli was terminated "because he lied repeatedly about how he obtained the Humvee and engaged in a fist fight with civilians." *Id.* at 37. They therefore claim that there is no genuine dispute of material fact as to whether they retaliated against Mr. Miceli.

In response, Mr. Miceli argues that the temporal proximity of his CHRO complaint to the adverse employment actions creates a genuine issue of material fact on the issue of retaliation, as does the "disparate treatment afforded Catania and/or Phelps who engaged in far more 'aggressive' or 'confrontational' actions and received no fitness for duty, suspensions or investigation." Pl.'s Opp – Town Defs. at 21. Mr. Miceli argues that the Town Defendants ordered his fitness for duty exam and psychological counseling "without basis" and due to "the perception that [he] was mentally disabled." *Id.* at 13.

Furthermore, Mr. Miceli argues that they also retaliated against him for his complaint of corruption to the Chief State's Attorney, and labeled him as mentally disabled, thus "infecting [his] workplace and other officers who confronted him with the false perception put upon him." *Id.* He claims the Town Defendants labeled him as mentally disabled, which destroyed his reputation in the department, and that all of this occurred "in close proximity to plaintiff's complaint to the Chief State's Attorney." *Id.*

The Court disagrees.

Mr. Miceli's ADA retaliation claim fails for the same reasons as his ADA discrimination claim. First, as the Court has already noted above, the Town Defendants have articulated legitimate and nondiscriminatory reasons for terminating Mr. Miceli's employment. As a result, Mr. Miceli has failed to establish a direct causal connection with his termination in the form of retaliatory animus. Second, Mr. Miceli has not established an indirect causal connection between his CHRO complaint and an adverse employment action.

Mr. Miceli claims a causal connection indirectly, due to the temporal proximity of his CHRO complaint and his termination as evidence of the Town Defendants' pretext. *See* Pl.'s Opp. – Town Defs. at 21.  But "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013). A plaintiff would need other evidence, in addition to temporal proximity, "such as inconsistent employer explanations, to defeat summary judgment." *Id.* (collecting cases).

 "Evidence of pretext may include temporal proximity between the protected activity and the adverse action plus additional evidence either showing retaliatory animus or disproving the truth of the employer's legitimate reason for the adverse action." *Siusdak v. Sessions*, 295 F. Supp. 3d 77, 105 (D. Conn. Feb. 21, 2018).  When temporal proximity is the only basis for a

*prima facie* case, the time gap is typically brief. *See Zann Kwan*, 737 F.3d at 845 (the three-week period between plaintiff's complaint to her termination was "sufficiently short"); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (holding that one month is sufficient to show causation); *Johnson v. Connecticut Dep't of Corr.*, 392 F. Supp. 2d 326, 341 (D. Conn. 2005) ("[C]ourts in the Second Circuit have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the filing of the complaint and the alleged retaliation.") ((citing *White v. Whitman*, 99-civ-4777, 2002 WL 776589, at *12 (S.D.N.Y. Apr. 26, 2002) (collecting cases)).

Even viewed in the light most favorable to him, Mr. Miceli has not provided the additional evidence of the allegedly pretextual nature of the Town Defendants' nondiscriminatory reasons for his termination. *See Zann Kwan*, 737 F.3d at 854 ("Whatever modest probative value temporal proximity might have in this case is washed away by the facts that Plaintiff did not offer any evidence to suggest that the decision-makers who fired her knew about the complaints she allegedly made [about gender discrimination] and that Plaintiff did not produce any evidence to undermine [Defendant's] position that her performance was demonstrably poor and incompatible with its shift in business focus.").

Significantly, Mr. Miceli filed his CHRO complaint on December 23, 2015. *See* OCSA Letter at 1. But the FBI already had been investigating the Humvee and tractor purchase by Mr. Miceli and the Town of Rocky Hill already had been responding to complaints filed by Mr. Lombardo, regarding Mr. Miceli, before both the OCSA Letter and the initial CHRO complaint. *See* Pl.'s SMF – Town Defs. ¶ 17 (on May 12, 2015, two FBI agents interviewed Mr. Miceli regarding his purchase of the Humvee); Pl.'s SMF – Lombardo at ¶ 20 (claiming that from October 2014 onwards, Mr. Lombardo "allegedly initiated and pursued a complaint of slander

and false complaints and investigations against" Mr. Miceli); *id.* ¶ 7 (alleging that in May 2015, Mr. Lombardo and then-Interim Town Manager Scaife wrongfully called the State Department of Transportation on Mr. Miceli because his vehicle and a rock were in the state right of way). Indeed, Mr. Miceli refers to the complaints preceding both in his June 19, 2015, OCSA Letter. *See* OCSA Letter at 1-4 (referencing the FBI interview and various complaints regarding Mr. Lombardo).

Also, although Mr. Miceli alleges that when Lt. Catania began his investigation on August 6, 2015, the Town Defendants were already on notice about his June 19, 2015 OCSA Letter, Pl.'s Opp. – Town Defs. at 14, Lt. Catania could not recall the date on which he found out about the OCSA Letter, *see* Catania Depo. at 136:6-138:11 (noting that he notified Interim Town Manager Scaife about the OCSA Letter, based on Chief Custer's instructions, when he became aware the letter existed, but not recalling when that date was), and the Town Defendants maintain that they did not have knowledge of the OCSA Letter until February 2, 2016, when they received notice of the CHRO complaint, Town Defs. Mem. at 34; *see also* Ex. J: Notice of Charge of Discrimination, ECF No. 135-18 (Feb. 2, 2016).

Without record evidence of notice of the complaints until February 2, 2016, the time period to establish temporal proximity started then, not when Mr. Miceli filed the CHRO complaint in December of 2015. In any event, the time gap of almost ten months between the CHRO complaint and his termination fail to establish an indirect causal connection through temporal proximity. *See, e.g.*, *Hollander v. Am. Cynamid Co.*, 895 F.2d 80, 86 (2d Cir. 1990) (affirming district court's finding that there was no causal nexus despite time gap of only three months).

Mr. Miceli also argues that Mr. Daigle's investigations were retaliatory and the time gap

between the first CHRO complaint and Mr. Daigle's investigations do deserve a closer look. The record shows that Rocky Hill first retained Mr. Daigle on April 1, 2016, which is two months after the Town Defendants received notice of the CHRO complaint. *See* Daigle Report – Humvee at Ex. C: Retention Letter. Although this two-month period could suffice to establish adequate temporal proximity, it alone is insufficient to establish retaliation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("[C]ases that accept mere temporal proximity . . . as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be very close." (internal citation omitted)).

Finally, Mr. Miceli claims disparate treatment in comparison to Lt. Catania and Sgt. Phelps, because they only had a meeting with Human Resources, did not have a fitness for duty examination or undergo an internal investigation, and were not terminated. *See* Pl.'s Opp. – Town Defs. at 21. But "[w]hen considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, . . . the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). The altercation between Lt. Catania and Sgt. Phelps is distinguishable from Mr. Miceli's actions in several ways. First, Lt. Catania and Sgt. Phelps had a verbal argument as co-workers. *See* Phelps Depo. at 51:3 ("[W]e had a verbal argument."). Second, there is no evidence in this record that either Lt. Catania or Sgt. Phelps lied about acquisitions of Town property or that they had verbal or physical altercations with civilians–the reasons underlying Mr. Miceli's termination. Mr. Miceli thus has not shown that Lt. Catania and Sgt. Phelps were "similarly situated employees who went undisciplined [like him, and] engaged in comparable conduct." *See Graham*, 230 F.3d at

40.

As a result, Mr. Miceli has failed to establish a causal connection between either the

OCSA Letter or the CHRO complaint and his termination, and there is no genuine issue of

material fact as to whether the Town Defendants retaliated against Mr. Miceli.

Accordingly, Mr. Miceli's ADA retaliation claim against the Town Defendants will be

dismissed.

### C. The First Amendment Retaliation Claim

Section 1983 provides a private right of action against state and local government

officials for Constitutional violations:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen
> of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . .

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but merely provides a

method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271

(1994) (internal quotations and citation omitted).

To state a First Amendment retaliation claim sufficient to withstand a motion for

summary judgment, the plaintiff must set forth evidence demonstrating "'(1) that the speech at

issue was protected; (2) that he suffered an adverse employment action; and (3) that there was a

causal connection between the protected activity and the adverse employment action.'" *Cotarelo

v. Village of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006). "Even if the plaintiff

demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it

can show that it would have taken the same adverse employment action 'even in the absence of

the protected conduct.'" *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) (quoting *Mount Health City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Additionally, a "government employee must show that his speech was on a matter of public concern in order for that speech to be protected under the First Amendment." *Cotarelo*, 460 F.3d at 252 (citing *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir. 1993)). "Generally, speech on 'any matter of political, social, or other concern to the community is protected.'" *Id.* (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (finding that police officer comments on crime rates, police staffing, equipment shortages, and budget matters were of public concern)). The existence of discrimination in a government workplace is a matter of public concern. *See, e.g.*, *Mandell v. County of Suffolk*, 316 F. 3d 368, 382-83 (2d Cir. 2003) (holding that it was a matter of public concern for plaintiff to criticize defendant police department's "approach to fighting organized crime, its resistance to change, and its systemic racism and anti-Semitism"). But "the government, as an employer, has a legitimate interest in regulating the speech of its employees to promote the efficiency of public service." *Id.* at 382.

Although "[t]he heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose,'" *Ruotolo v. City of New York*, 514 F. 3d 184, 189 (2d Cir. 2008) (citing *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999)), "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." *Sousa v. Roque*, 578 F.3d 164, 173-74 (2d Cir. 2009) (concluding that the district court erred in finding that plaintiff's "speech did not address a matter of public concern because he was motivated by employment grievances"). "Whether or not speech addresses a matter of public concern 'must be determined by the content, form, and context of a

given statement, as revealed by the whole record.'" *Sousa*, 573 F.3d at 175 (citing *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Mr. Miceli alleges retaliation in violation of the First Amendment of the U.S. Constitution. The alleged protected speech is his OSCA Letter. *See* Ex. J: Miceli's Letter to State Wide Prosecution, ECF No. 135-12 (June 19, 2015).

The Town Defendants argue that Mr. Miceli's claims fail as a matter of law for the following reasons: (1) the individual Town Defendants are entitled to qualified immunity; (2) there is no evidence that Mr. Miceli engaged in protected speech; (3) there is no evidence that the Town Defendants terminated Mr. Miceli on the basis of protected speech. Town Defs. Mem. at 18. They argue that Mr. Miceli's OSCA Letter refers to complaints that are personal in nature. *Id.* at 27. They emphasize that his letter "essentially claim[ed] that members of the Town Administration collaborated with his neighbor in order to harass him," and that clearly Mr. Miceli "did not write that letter to expose official misconduct," but to "vindicate his own interests and rehabilitate his reputation." *Id.* at 30.

In response, Mr. Miceli argues that his speech was protected because the complained-of conduct by Defendants was a matter of public concern. Pl.'s Opp. – Town Defs. at 16. He argues that, in his OCSA Letter, he "complained of acts that affected him as a citizen of the Town of Rocky Hill." *Id.* at 17. Mr. Miceli emphasizes that he complained about Rocky Hill planning and zoning, alleged harassment over a certificate of occupancy from prior construction work, alleged harassment by the Rocky Hill tax assessor, fines, and citations, as well as the alleged retaliatory conduct by Rocky Hill. *Id.* at 18 (citing OCSA Letter). Although Mr. Miceli admits he was partly motivated by his own grievances, he claims that he also wanted to "expose official misconduct." *Id.* at 19-21. Finally, he emphasizes that there is "sufficient evidence of disparate treatment and

retaliatory animus" to establish a First Amendment claim. *Id.* at 26.

In reply, the Town Defendants emphasize that part of Mr. Miceli's duties as a police officer was to "report any alleged corruption or abuse of power by government officials." Town Defs. Reply at 7. Therefore, even if his OCSA Letter is found to be speech on a matter of public concern, it would still not qualify as protected speech under the First Amendment. *Id.*

The Court agrees.

First, as noted above, both the FBI investigation of the Humvee and tractor purchase and Rocky Hill's actions against Mr. Miceli regarding the complaints from Mr. Lombardo occurred before the OSCA Letter, undercutting any notion that any actions taken regarding these two matters could have resulted in retaliation from the OSCA Letter. *See* Pl.'s SMF – Town Defs. ¶¶ 15-19 (describing the FBI investigation into the Humvee and tractor, which began after the U.S. Attorney's Office received a complaint from Rocky Hill in March 2015); Offutt Depo. at 21:4-19 (in an interview with FBI Special Agent Offutt on May 12, 2015, Mr. Miceli "stated that a friend of his put up half the money and paid $50 toward the total $100" for the Humvee and tractor.); *cf.* OCSA Letter at 1 (dated June 19, 2015).

Second, although Mr. Miceli's OCSA Letter purports to address general issues of corruption within Rocky Hill, the letter raises issues related solely to him and his issues with Mr. Lombardo. *See* OCSA Letter. *See Cotarelo*, 460 F.3d at 252 (recognizing as a matter of public concern a situation wherein "the letter and the complaints in the lawsuits concern discrimination problems generally and were not limited to instances affecting only Cotarelo."). Mr. Miceli details various issues involving his house and property, and related fines and citations. OCSA Letter at 1-2. He alleges that Mr. Lombardo falsely complained about his house and property, and that then-Interim Town Manager Scaife supported Mr. Lombardo in harassing Mr. Miceli.

*Id.* Mr. Miceli states, "I believe that Guy Scaife, [sic] is abusing his power as Town Manager by harassing me with fines and bullying me to get what he wants." OCSA Letter at 4.

"Viewed objectively and as a whole," Mr. Miceli's statements do not address matters of public concern. *See Ezekwo v. New York City Health & Hospitals Corp.*, 940 F. 2d 775, 781 (2d Cir. 1991) (holding that a physician's complaints were not a matter of public concern because her primary aim was to protect her own reputation and not for the public welfare). In addition, as to Mr. Miceli's motive, the "content, form, and context" of the OCSA Letter does not relate to a matter of public concern, and also only involves his personal grievances with Mr. Lombardo and Mr. Scaife. *See Connick*, 461 U.S. at 147. Mr. Miceli has not pointed to any evidence that the OCSA Letter involves a matter broader than his own personal grievances with Mr. Scaife and Mr. Lombardo. In fact, the OCSA Letter involves him speaking as a private citizen on private matters. Accordingly, it does not involve a matter of public concern, and does not constitute protected speech under the First Amendment, at least with respect to Mr. Miceli's employment with the Town of Rocky Hill.

Finally, even if Mr. Miceli's OSCA Letter involved a matter of public concern, as noted above, his First Amendment retaliation claim fails for the same reasons his ADA and ADA retaliation claims do: the absence of a genuine issue of material fact that his termination was the result of discrimination of any kind.

Because there is no genuine issue of material fact as to whether Mr. Miceli's OCSA Letter addresses a matter of public concern or even if it did, whether he has a viable First Amendment retaliation claim, the Court need not reach the issue of qualified immunity.

Accordingly, Mr. Miceli's First Amendment retaliation claim will be dismissed.[5]

---

[5] Mr. Miceli also argues that the Town Defendants failed to address his First Amendment *Monell* claim, but it is not clear he pled such a claim. *See* Compl. ¶¶ 47-51 (alleging First Amendment retaliation generically against the

### D.  The State-Law Claims

Having dismissed all of Mr. Miceli's federal claims, the Court declines to exercise supplemental jurisdiction over Mr. Miceli's state law claims. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction'" (citing 28 U.S.C. § 1367(c)(3)); *Castellano v. Bd. Of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1991) ("[I]f the federal claims are dismissed before trial . . . , the state claims should be dismissed as well."); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").

As a result, the Court will not address Mr. Miceli's claims under the CFEPA against the Town Defendants, the intentional infliction of emotional distress claims against both the Town Defendants and Mr. Lombardo, and nor will the Court address the claims of defamation and tortious interference with contract against Mr. Lombardo alone.

---

"defendants" without specifying anything with respect to an official policy or custom of the Town of Rocky Hill). In any event, because the Court finds there was no underlying First Amendment violation attributable to the Town Defendants, the municipality of Rocky Hill could not be held liable under *Monell*. *See, e.g.*, *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) ("The municipality cannot properly be held liable . . . unless the injury was inflicted by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." (internal citations omitted)); *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

## IV.     CONCLUSION

For the foregoing reasons, the Town Defendants' motion for summary judgment is

**GRANTED** with respect to the ADA discrimination claim, the ADA retaliation claim, and the

First Amendment retaliation claim**.**

The Court declines to exercise supplemental jurisdiction over the remaining state law

claims against the Town Defendants, and similarly declines to exercise supplemental jurisdiction

over the claims against Mr. Lombardo.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 4th day of November, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE
